IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Darrell M.,[1] | ) | C/A No.: 1:23-4699-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Martin O'Malley, [2] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Mary Geiger Lewis, United States District Judge, dated September 26, 2023, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Martin O'Malley was confirmed by the Senate and sworn in as Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), he is substituted for Kilolo Kijakazi as a party to this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On February 25, 2021, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on May 23, 2019.[3] Tr. at 130, 131, 288–90, 291–97. His applications were denied initially and upon reconsideration. Tr. at 160–63, 165–68, 172–76, 177–81, 182–84, 185–87. On September 30, 2022, Plaintiff had a hearing by telephone before

---

[3] Plaintiff's application notes the following: "ONSET WAS CHANGED FROM 05/31/2016 TO 05/23/2019 BASED ON UNFAVORABLE HEARING DECISION DATED 05/22/2019. ONCE ODAR HAS RENDERED AN UNFAVORABLE DECISION[,] EARLIEST POSSIBLE ONSET DATE IS 05/23/2019 DAY AFTER DATE OF DECISION." Tr. at 290. However, the May 22, 2019 decision was not an administratively final decision because the Appeals Council remanded the case. The prior ALJ issued a second unfavorable decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, from May 31, 2016, through September 18, 2020, the date of that decision. Tr. at 65–77. This court affirmed the ALJ's decision in an order dated February 14, 2022. Tr. at 152–53. Thus, it appears the September 18, 2020 decision—as opposed to the May 22, 2019 decision— should have been used to determine Plaintiff's alleged disability onset date.

Administrative Law Judge ("ALJ") Ronald Sweeda. Tr. at 49–64 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 20, 2022, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 29–48. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 19, 2023. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 53 years old at the time of the hearing. Tr. at 52. He completed high school. Tr. at 318. His past relevant work ("PRW") was as a janitor and a hardwood floor sander. Tr. at 318. He alleges he has been unable to work since May 23, 2019. Tr. at 289.

#### 2.    Medical History

During a visit to Harvest Free Medical Clinic ("HFMC") on May 20, 2019, Plaintiff reported he had completed the semester at Trident Technical College and planned to continue with classes in the fall. Tr. at 405. He denied complaints and indicated he was walking two blocks at a time, several times a day. *Id.* William Simpson, M.D. ("Dr. Simpson"), noted Plaintiff's weight had decreased by three-and-a-half pounds since his last visit. *Id.* He stated

Plaintiff continued to demonstrate residual hemiparesis, but was able to walk "relatively small distances (he reports two blocks without rest)" while using a cane. *Id.* He noted Plaintiff's diagnoses included paralysis of dominant side as sequela of cerebrovascular accident ("CVA"), hypercholesterolemia, and hypertension complication. *Id.* He encouraged Plaintiff to continue at his current or a greater level of activity and to follow a heart-healthy diet. Tr. at 405–06. He continued Amlodipine Besylate 5 mg, Lisinopril 20 mg, Atorvastatin Calcium 80 mg, Aspirin 325 mg, and Hydrochlorothiazide 25 mg. Tr. at 406.

Plaintiff returned to HFMC on August 19, 2019, and reported he was working on his weight in a group setting, drinking one beer or less daily, and not smoking. Tr. at 403. He stated his right leg felt more tingly and slightly more painful, but less swollen that it had during the prior visit. *Id.* Dr. Simpson noted Plaintiff's weight had decreased by more than 12 pounds over the prior three-month period. *Id.* He observed trace edema to the right ankle and residual neurological weakness in the right upper and lower extremities, and decreased swelling in the right leg. *Id.* He encouraged increased physical activity and weight loss, discontinued Amlodipine Besylate 5 mg, and refilled Lisinopril 20 mg, Atorvastatin Calcium 80 mg, Aspirin 325 mg, and Hydrochlorothiazide 25 mg. Tr. at 403–04.

Plaintiff reported no complaints during a routine visit to HFMC on November 26, 2019. Tr. at 401. He said he had lost some weight and felt better. *Id.* Joel Robert Freeman, M.D. ("Dr. Freeman"), noted Plaintiff did not appear to be taking his medication as directed because he had "40–60 of each med left." *Id.*

On a visit to HFMC on February 25, 2020, Plaintiff reported he had been exercising and trying to lose weight. Tr. at 400. He indicated he had stopped taking Hydrochlorothiazide two to three months prior because his "foot [was] no longer swollen" and was only taking half of a Lisinopril tablet after being told to decrease the dose following a wellness check at the Medical University of South Carolina ("MUSC"). *Id.* He noted he continued to smoke one cigarette per day. *Id.* Steven Lenes, M.D. ("Dr. Lenes"), instructed Plaintiff to resume use of a whole Lisinopril tablet, monitor his blood pressure at home, and stop smoking. *Id.* He continued Atorvastatin Calcium 80 mg, Aspirin 325 mg, and Lisinopril 20 mg. Tr. at 400–01.

On May 26, 2020, Plaintiff denied complaints and requested medication refills. Tr. at 399. He noted he had lost 13 pounds by eating fish and vegetables and had last smoked a cigarette four days prior. *Id.* Dr. Lenes recorded normal findings on exam and continued the same medications. *Id.*

Dr. Lenes noted weight gain during a routine follow up visit on August 18, 2020. Tr. at 398. Plaintiff admitted he had not been exercising because of

the heat. *Id.* He indicated his providers at MUSC's weight loss clinic had recommended he stop his blood pressure medication after he presented to an appointment with low blood pressure and rapid pulse. *Id.* Dr. Lenes discontinued Amlodipine and instructed Plaintiff to continue taking half of a Lisinopril tablet daily and to monitor his blood pressure. *Id.* He continued Plaintiff's medications. *Id.*

Plaintiff returned to HRMC for routine follow up on November 17, 2020. Tr. at 397. He reported some residual soreness after being injured the prior day when the bus he was sitting in the back of was rear-ended by another vehicle. *Id.* He noted he had visited the ER and received pain medication. *Id.* He denied numbness, weakness, and tingling. *Id.* He requested to see an eye doctor to address difficulty seeing and residual deficits, redness, mattering, and dryness in his left eye, especially at night. *Id.* Dr. Lenes noted conjunctive erythema in Plaintiff's left eye. *Id.* He assessed dry eyes, instructed Plaintiff to use artificial tears, and discussed visiting an optometrist and using Zenni for glasses. *Id.* He refilled Lisinopril 20 mg and Atorvastatin Calcium 80 mg. *Id.*

On January 26, 2021, Patrick M. O'Neil, Ph.D. and Robert Malcolm, M.D., provided a letter stating Plaintiff was enrolled in SELECT—Semaglutide Effects on Cardiovascular Outcomes in People with Overweight or Obesity, a clinical trial through MUSC. Tr. at 408. They noted Plaintiff

6

qualified to participate in the research study based on his history of documented stroke. *Id.* They noted Plaintiff was receiving weekly injections of either Semaglutide, which had been studied as a weight loss medication, or a placebo. *Id.* They pointed out Plaintiff had lost 28.2 pounds since enrolling in the study on July 25, 2019, but continued to be classified in the obese category. *Id.* They stated Plaintiff received dietary counseling and low-calorie diet recommendations from registered dieticians. *Id.* They expected Plaintiff to continue in the study through June 2024. *Id.*

On May 7, 2021, Martin Smith, M.D. ("Dr. Smith"), a physician at HFMC, completed a form addressing mental conditions at the request of the Social Security Administration ("SSA"). Tr. at 391. He noted Plaintiff had no mental health diagnosis, psychiatric care had not been recommended, and medication for a mental condition had not been prescribed. *Id.* He wrote: "Declined to fill out majority of this form as the primary problems documented in the chart are not related to mental health and no medications have been prescribed for this purpose . . . ." *Id.*

Plaintiff presented to William Maguire, Jr., M.D. ("Dr. Maguire"), for a consultative exam on June 7, 2021. Tr. at 456–59. He reported residual right arm and leg and left face weakness, tingling, and numbness following a stroke five years prior. Tr. at 456. He indicated his memory did "not seem as sharp," his speech seemed somewhat slurred, and his vision tended to blur

"off and on." *Id.* He described left eye dryness, wateriness, and blurring, left-sided headaches once or twice a day, and poor balance. *Id.* He endorsed abilities to cook, clean, bathe, and dress himself somewhat slowly. *Id.* He described poor energy and said he felt like he may be becoming somewhat depressed. *Id.* His visual acuity without glasses was 20/30. *Id.* Dr. Maguire noted Plaintiff had a limp and used a cane that he carried in his right hand. *Id.* He indicated Plaintiff had normal strength in his face and extremities, normal range of motion of the bilateral biceps, normal bilateral ankle jerk, and slightly less knee jerk on the right than the left. Tr. at 457. He stated Plaintiff appeared to have a slight left upper eyelid droop. *Id.* He indicated Plaintiff could remember three of three objects at three minutes and was very lucid and well-spoken. *Id.* However, he noted Plaintiff's ability to complete rapid alternating movements with the right hand was somewhat sluggish and his speech was "a bit slower and a little bit sluggish." *Id.* He wrote:

> History of stroke. The patient does have some limitations subjectively. He has a little bit of trouble walking, walking with a slight limp, some difficulty with his right nondominant hand rapid movement. The decreased sensation per se would probably not be disabling, and his speech does seem okay. The blurred vision apparently comes and goes. The headache would cause him some subjective discomfort during these headaches which would cause him some limitations working. Also the poor energy which may be related to the history of stroke versus something else would cause him some subjective limitations as well.

Tr. at 458.

On June 17, 2021, state agency medical consultant Sherrial Simmers, M.D. ("Dr. Simmers"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; frequently handle and finger with the right upper extremity; and avoid concentrated exposure to extreme heat and hazards. Tr. at 103–07, 118–23.

On July 20, 2021, Plaintiff reported he had developed right leg weakness in late-May that led to a couple of falls. Tr. at 481. He described an event in which his knee "went out of socket," requiring him to twist it back into place. *Id.* Dr. Lenes noted Plaintiff's left eye was noticeably red, and Plaintiff indicated he needed an eye appointment because his vision was worsening and causing headaches. *Id.* Dr. Lenes observed marked conjunctival erythema and down-going left eye lid. *Id.* He assessed dry eyes and indicated Plaintiff should make an appointment with Storm Eye to reevaluate his left eye. *Id.*

On October 22, 2021, state agency psychological consultant Holly Hadley, Psy.D. ("Dr. Hadley"), reviewed the record and completed a psychiatric review technique. Tr. at 136–37, 145–46. She considered listings

for neurocognitive disorders and depressive, bipolar, and related disorders and determined Plaintiff's impairments did not meet the listings. Tr. at 136, 145. She assessed no limitations in Plaintiff's abilities to understand, remember, or apply information, interact with others, and adapt or manage oneself and only mild limitations in his abilities to concentrate, persist, or maintain pace. *Id.* She noted Plaintiff's history of stroke and his statement that he felt depressed during the consultative exam, but indicated the objective evidence contained no indication of cognitive or mental issues. Tr. at 137, 146. Accordingly, she concluded Plaintiff's mental impairments were nonsevere. *Id.*

State agency medical consultant Cynthia Heldrich, M.D. ("Dr. Heldrich"), also reviewed the record on October 22, 2021, and assessed the same physical RFC as Dr. Simmers, except that she indicated Plaintiff should avoid concentrated exposure to humidity. *Compare* Tr. at 103–07 *and* 118–23, *with* Tr. at 138–40 *and* 147–49.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff testified he was 5'10" tall and weighed 205 pounds. Tr. at 52. He denied having a driver's license, as he was no longer able to drive. Tr. at 53. He stated he had not worked since May 23, 2019. *Id.* He indicated he had

previously worked as a janitor and had performed siding and finishing work. *Id.*

Plaintiff testified he could no longer work because he had "a high fatigue factor," was "high[ly] sensitive to heat," had "balance problems," and had poor reaction time that prevented him from driving. *Id.* He said he had developed problems with the arches in his feet after taking a water pill. *Id.* He stated he required orthopedic shoes and a cane. Tr. at 54. He indicated he had contacted vocational rehabilitation, but they could not help him because he was "only good for two hours." *Id.*

Plaintiff stated his pain was mostly in his feet, except for "every now and then" when he had headaches and dizziness. *Id.* He explained that following his stroke, he had participated in rehabilitation and had relearned basic functions. *Id.* He stated he was unable to control his body temperature. Tr. at 55.

Plaintiff estimated he could sit for 30 minutes and stand for 30 minutes at a time. *Id.* He stated the "fatigue start[ed] kicking in" after about 30 minutes. *Id.* He said he could walk "[m]aybe a block" over the course of 20 to 30 minutes." Tr. at 55–56. He described numbness in his right arm and indicated he had "no grip strength" in either hand. Tr. at 56. He said he could no longer type. *Id.*

Plaintiff denied receiving current medical treatment because he was "not trying to accrue any more bills." *Id.* He indicated he had not applied directly for Medicaid. *Id.*

Plaintiff stated he was living in an apartment with a friend. Tr. at 57. He endorsed abilities to shower and dress on his own and to clean his room. *Id.* He said his daughters typically picked up his laundry and brought him food. *Id.* He stated he would "read a lot" during the day. *Id.*

Plaintiff testified his right side had been more affected by the stroke than his left. Tr. at 58. He said the left side of his face was also partially numb. *Id.* He described "a film that c[ame] over [his eye] every morning when [he] w[oke] up," causing his left eye to be partially closed and "heavily caked up." *Id.* He stated he need to wash out his eye every 20 minutes. *Id.*

Plaintiff stated he was left-handed and used his cane in his left hand because the right hand tired too quickly. *Id.* He estimated he could lift no more than five pounds with his right hand due to lack of strength. Tr. at 58–59. He said he could button buttons and tie shoes with a little difficulty. Tr. at 59.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Shannon Smith reviewed the record and testified at the hearing. Tr. at 60–63. The VE categorized Plaintiff's PRW as a sander, *Dictionary of Occupational Titles* ("*DOT*") No. 662.685-034 and a

hospital cleaner, *DOT* No. 323.687-010, both requiring medium exertion and having a specific vocational preparation ("SVP") of 2. Tr. at 60. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with no climbing of ladders or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequent fingering and handling with the non-dominant right upper extremity; and no exposure to extreme heat, high humidity, or work hazards. *Id.* The VE stated the restriction would preclude Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. Tr. at 61. The VE identified light, unskilled jobs with an SVP of 2 as a merchandise marker, *DOT* No. 209.587-034, a rental clerk, *DOT* No. 295.367-026, and a small product assembler, *DOT* No. 706.684-022, with 225,000, 104,000, and 22,000 positions in the national economy, respectively. *Id.* The ALJ asked the VE if work would be precluded if he reduced the exertional level to sedentary. *Id.* The VE stated that was correct. *Id.* She also confirmed that Plaintiff's PRW produced no transferable skills. *Id.*

The ALJ asked the VE if her testimony had been consistent with the *DOT*. *Id.* The VE explained her testimony had been consistent with the *DOT*, except that the *DOT* did not distinguish between bilateral and unilateral

handling and fingering, and she considered that restriction based on her professional experience. Tr. at 61–62.

Plaintiff's counsel asked the VE to consider that the individual would be limited to occasional fingering and handling with the right upper extremity. *Id.* The VE testified there would be no light, unskilled jobs. Tr. at 63.

### 2.    The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2.    The claimant has not engaged in substantial gainful activity since May 23, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: status post cerebrovascular accident (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant can lift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently. He can sit for 6 hours in an 8-hour day and stand and/or walk for 6 hours in an 8-hour day, with normal breaks. The claimant cannot climb ladders, ropes or scaffolds. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He can perform frequent fingering and handling with the right upper extremity. The claimant can have no exposure to extreme heat, high humidity, or work hazards.

14

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on May 28, 1969 and was 50 years old,[4] which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 23, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 34–42.

## II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ failed to resolve inconsistent, insufficient, or incomplete evidence; and

2)     the ALJ did not account for his mild limitations in maintaining concentration, persistence, or pace in the RFC assessment.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

---

[4] Plaintiff was 49 years old on May 23, 2019, the alleged disability onset date.

15

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4)

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982).

---

C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*,

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Resolution of Evidence

Plaintiff generally argues the ALJ failed to obtain evidence required to resolve ambiguities and complete the record, particularly with respect to his headaches and vision problems. [ECF No. 13 at 12–19]. The Commissioner refutes Plaintiff's argument and maintains the ALJ appropriately determined that the record was sufficient for him to find Plaintiff was not disabled. [ECF No. 14 at 9–19].

A claimant generally bears the burden to produce evidence of disability. *See Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). Despite the claimant's burden, the ALJ maintains "a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)).

If the evidence in a claimant's record is insufficient or inconsistent, the ALJ may need to take additional action. 20 C.F.R. §§ 404.1520b(b),

416.920b(b). Evidence is insufficient "when it does not contain all the information [the ALJ] need[s] to make [a] . . . decision." *Id.* Evidence is inconsistent "when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." *Id.* If the record contains inconsistent evidence, the ALJ may consider the relevant evidence in the record to determine whether it allows him to make a disability decision. 20 C.F.R. §§ 404.1520b((b)(1), 416.920b(b)(1). If the evidence is consistent, but insufficient for the ALJ to make a disability determination, the ALJ is to determine the best way to resolve the issue. 20 C.F.R. §§ 404.1520b(b)(2), 416.920b(b)(2). The ALJ may resolve the issue by: (i) recontacting the claimant's medical source; (ii) requesting additional evidence; (iii) referring the claimant for a consultative examination; or (iv) asking the claimant for more information. *Id.*

Pursuant to SSR 16-3p, the ALJ is to "develop evidence regarding a potential medically determinable impairment" if the record contains "insufficient evidence to determine whether an individual has a medically determinable impairment that could potentially account for his or her alleged symptoms." SSR 16-3p, 2017 WL 5180304, at *4 (2017). "While the ALJ must make a reasonable inquiry into a claim of disability, he has no duty 'to go to inordinate lengths to develop a claimant's case.'" *Craft v. Apfel*, 164 F.2d 624,

1998 WL 702296, at *2 (4th Cir. 1998) (per curiam) (unpublished table decision) (citing *Thomas v. Califano*, 556 F.2d 616, 618 (1st Cir. 1977).

However, "[w]here the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980) (citing *Cutler v. Weinberger*, 516 F.2d 1282 (2nd Cir. 1975); *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837 (3rd Cir. 1974); *Hicks v. Mathews*, 424 F. Supp. 8 (D. Md. 1976)).

The court described the appropriate inquiry in *Hammond v. Astrue*, C/A No. 3:11-871, 2012 WL 4118277, at *9 (S.D.W. Va. Sept. 19, 2012), explaining:

> When considering whether the record before an ALJ was adequate, a reviewing court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to the claimant, and remand is warranted only when the absence of available documentation creates a likelihood of prejudice. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995). The burden to establish disability rests with the claimant. Thus, to successfully demonstrate that the ALJ relied on an insufficient record, the claimant must "indicate what evidence the ALJ failed to seek," *Rose v. Commissioner of Social Security*, No. 98-2169, 1999 WL 147618, at *2 (4th Cir. Mar. 18, 1999) (unpublished), and "how [the evidence] would have impacted the ALJ's assessment." *Bell* [*v. Chater*, 57 F.3d 1065 (Table), 1995 WL 347142 (4th Cir. 1995)]. Simply stated, the claimant is required to make a showing of how he or she was prejudiced by the ALJ's alleged failure to fully develop the evidence. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

The court considers Plaintiff's specific allegations of error in light of the foregoing authority.

      a.    Evidence Regarding Headaches

Plaintiff claims the ALJ erred in finding Dr. Maguire's statements about his headaches were "somewhat vague, as he did not set forth any specific functional limitations" and his opinion was not consistent with the record that showed little treatment for headaches over the relevant period. [ECF No. 13 at 12]. He maintains the ALJ's error was similar to that identified in *Oakes v. Kijakazi*, 70 F.4th 207, 214 (4th Cir. 2023). *Id.* at 12–13. He claims the ALJ erred in declining to contact Dr. Maguire to obtain an explanation of the ambiguity and in failing to consider his testimony and other evidence of his difficulty obtaining treatment due to lack of income and insurance. *Id.* at 13. He contends that although he was treated through a free clinic, he lacked access to specialized care from a neurologist, ophthalmologist, and cerebrovascular provider for his migraines, vision problems, and effects of stroke. *Id.* He asserts the ALJ committed error similar to that identified in *Woody v. Kijakazi*, No. 22-1437, 2023 WL 5745359 (4th Cir. 2023) and *Rogers v. Kijakazi*, 62 F.4th 872, 880–81 (4th Cir. 2023), by assuming he would function consistently throughout a workweek without making factual findings as to the length, frequency, and

severity of his headaches or considering that his functioning would be reduced when he was experiencing them. *Id.* at 14–15.

The Commissioner argues the facts in this case are not analogous to those in *Oakes*, where the record consisted of only two emergency room records and a consultative exam report in which the ALJ gave "short shrift to [the examiner's] device recommendation" by "fail[ing] to recognize the objective aspects of [the examiner's] diagnosis." *Id.* at 13–15. He argues recontacting Dr. Maguire would not have been valuable because he clearly indicated his opinion was based on Plaintiff's subjective symptoms, as opposed to his observations during the exam. *Id.* at 17. He disputes Plaintiff's allegation that the ALJ did not address his claim that his finances limited his treatment and notes the ALJ acknowledged the claim and pointed out his access to a free clinic and that he often reported mild or no complaints during his visits. *Id.* at 17–18. He contends the ALJ was not required to account for the intensity, frequency, and duration of Plaintiff's headaches in the RFC assessment because he explained the record contained limited reports of treatment for headaches, such that his headache allegations were unsupported. *Id.* at 18.

The ALJ acknowledged Plaintiff alleged headaches in his testimony, Tr. at 37, and "described headaches" to Dr. Maguire, Tr. at 38. He wrote: "Dr. Maguire noted the claimant's headaches would cause him some limitations

24

working," but he considered Dr. Maguire's "statements somewhat vague, as he did not set forth any specific functional limitations." Tr. at 39. The ALJ further explained:

> With respect to [Dr. Maguire's] opinion that the claimant's headaches would cause him some limitations, that opinion is not consistent with the medical evidence of record, which shows very little treatment of the claimant's headaches since the alleged onset date. Additionally, Dr. Maguire failed to specify how the claimant would be limited by those headaches.

*Id.*

Substantial evidence supports the ALJ's conclusion that Dr. Maguire's opinion was not consistent with the other evidence. The ALJ explained that the opinion conflicted with other evidence, which is a valid basis for a finding of inconsistency. *See* 20 C.F.R. §§ 404.1520b(b), 416.920b(b).

The evidence supports this conclusion, as it reflects Plaintiff's only mention of headaches to his treating provider was on July 20, 2021, when he said his worsening vision was causing headaches. Tr. at 481. "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints . . . [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9. Although Plaintiff reported frequent headaches during the consultative exam, in his hearing testimony, and in forms he

completed for the SSA,[7] his reports to his medical providers did not align with his allegations. As the ALJ pointed out, if Plaintiff's headaches were as disruptive as he alleged, one would expect him to seek treatment for them from his medical providers.

An ALJ cannot find a claimant's alleged symptoms to be inconsistent with the evidence based on the frequency or extent of treatment without considering possible reasons he may not comply with or seek treatment consistent with the degree of his complaints, SSR 16-3p, 2017 WL 5180304, at *9. Nevertheless, the ALJ acknowledged Plaintiff's allegation "that he was unable to seek further medical treatment due to limited finances." Tr. at 39. He reasonably concluded this did not explain Plaintiff's failure to seek treatment for headaches from his providers at HFMC, which provided "low-cost/no fee treatment." Tr. at 39.

The court further notes the evidence Plaintiff presented did not establish headaches as a medically-determinably impairment, as defined in

---

[7] Plaintiff completed an undated questionnaire regarding migraines. Tr. at 361. He reported he experienced headaches on the left side of his head for 30 minutes to one hour at a time that were associated with dizziness. *Id.* He stated his headaches occurred three to four times per week. *Id.* He described his headaches as feeling as if someone was squeezing with a lot of pressure. *Id.* He said he would take two aspirin to treat his headaches and they went away within three hours. *Id.* He denied taking medication to prevent headaches and requiring emergency treatment for them over the prior six-month period. *Id.* He explained the headaches were intense such that he "would have to stop[,] take pills[, and] lay down." *Id.* He noted the headaches also affected his balance. *Id.*

the regulations. A medically-determinable impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1521, 416.921. The impairment "must be established by objective medical evidence from an acceptable medical source." *Id.* The undersigned recognizes that headaches generally cannot be confirmed through laboratory diagnostic techniques, but because Plaintiff generally failed to report headache symptoms to his providers at HFMC, the record is devoid of any clinical evidence to support the existence of headaches. The SSA will not accept a claimant's "statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)." *Id.* Thus, Plaintiff's reports on SSA forms, to Dr. Maguire, and in his testimony are insufficient to establish headaches as a medically-determinable impairment.

The undersigned is not persuaded by Plaintiff's comparison of the ALJ's consideration of Dr. Maguire's opinion to that found erroneous in *Oakes*. In *Oakes*, 70 F.4th at 213, the Fourth Circuit found the ALJ erred in evaluating the supportability of the consultative examiner's opinion because he concluded it was based on the claimant's subjective symptoms where the record contained supporting objective evidence. It concluded that, given such evidence, "[t]o the extent that [the consultative examiner's] justification for

[the limitation] was ambiguous, the medical record [was] incomplete and the ALJ should have 'take[n] additional actions' to seek clarification." *Id.*

This case does not present the same scenario. Dr. Maguire wrote: "The headache would cause him some subjective discomfort during these headaches which would cause him some limitations working." Tr. at 458. Unlike the consultative examiner in *Oakes*, Dr. Maguire did not diagnose Plaintiff with an impairment consistent with his headaches, and his report does not reflect that he reviewed any records documenting Plaintiff's headache history. *Compare* Tr. at 456–58, *with* Oakes, 70 F.4th at 213. Also, unlike the consultative examiner in *Oakes*, Dr. Maguire explicitly acknowledged that such a restriction was based on Plaintiff's subjective allegations. *Compare* Tr. at 458, with *Oakes*, 70 F.4th at 213. In *Oakes*, "[a] simple inquiry could have resolved any ambiguities," 70 F.4th at 215, but here, the ambiguity arose not from differing conclusions as to a limitation, but from Dr. Maguire's reliance on Plaintiff's report of headaches and his inability to state with any certainty how those headaches affected Plaintiff's ability to perform specific work-related functions.

Plaintiff's reliance on the Fourth Circuit's decisions in *Rogers* and *Woody* is misplaced. In *Rogers*, 62 F.4th at 880–81, the court found the ALJ did not adequately consider the claimant's ability to perform work-related activities on a regular and continuing basis where he failed to address

28

evidence of drastically worsened mental functioning during the claimant's menstrual cycle. In *Woody*, 2023 WL 5745359, at *1, the court found "[t]he ALJ's failure to reach an 'express conclusion in the first instance' on the potentially dispositive issue of whether the frequency and severity of Woody's headaches would cause her to be absent from work more than once a month— or to explain how, despite any potential absences, the evidence supported his finding that the limitations included in the RFC sufficiently accounted for Woody's impairments—[was] an error of law that necessitate[d] remand." However, the ALJs in those cases were required to consider the claimants' subjective allegations because they had established the existence of impairments that could reasonably be expected to cause the symptoms they alleged.

An ALJ is not required to consider a claimant's statements as to how symptoms affect his ability to do basic work activities when the evidence does not establish a medically-determinable impairment that could reasonably be expected to produce the alleged symptoms. *See* 20 C.F.R. §§ 404.1529(b), 416.929(b). Because Plaintiff did not establish headaches as a medically-determinable impairment, the ALJ was not required to consider his subjective allegations as to them and did not err in failing to assess their duration, frequency, and severity.

The regulations provide that if the ALJ can evaluate the inconsistent evidence based on the other evidence of record, he is not required to further develop the record. *See* 20 C.F.R. §§ 404.1520b((b)(1), 416.920b(b)(1). The ALJ was not required to further develop the record prior to rejecting Dr. Maguire's indication that Plaintiff's headaches would cause him some work-related limitation because he adequately explained his reason for finding it inconsistent with the evidence, and recontacting Dr. Maguire would have been futile.

b.    Vision Problems

Plaintiff submits the ALJ should have ordered consultative exams to evaluate his new complaints and for a medical professional to assess his vision. [ECF No. 13 at 16–18]. He claims a vision exam might have yielded evidence that would show he could not perform the jobs identified at step five. *Id.* at 18.

The Commissioner maintains the ALJ considered the state agency consultants' and the consultative examiner's opinions and accounted for them in the decision. [ECF No. 14 at 11–12]. He contends the ALJ considered the treatment records and reasonably concluded they did not suggest a need for further development of the record. *Id.* at 12. He asserts the record contained sufficient evidence regarding Plaintiff's vision and that a second consultative exam was not required. *Id.* at 18–19.

SSA may purchase a consultative examination under the following nonexclusive list of circumstances:

    (1)    Additional evidence needed is not included in the records from the claimant's medical sources;

    (2)    Evidence is no longer available from treating or other medical sources for reasons outside the claimant's control, such as death or noncooperation of a medical source;

    (3)    The claimant's treating or other medical sources cannot provide highly technical or specialized medical evidence that is needed; or

    (4)    The current severity of the claimant's impairment is not established, as there is an indication of a change in condition likely to affect his ability to work.

20 C.F.R. §§ 404.1519a(b), 416.919a(b). SSA will only purchase "the specific examination and tests" it requires to reach a determination in the claim. 20 C.F.R. §§ 404.1519f, 416.1519f.

The court rejects Plaintiff's claim that the ALJ should have ordered a consultative exam to evaluate new complaints, aside from those concerning his vision. The ALJ's duty to develop the record does not require he refer a claimant for a consultative exam or additional testing merely because the evidence of record indicates relatively minor impairments and benign findings. *Caler v. Colvin*, C/A No. 1:14-1565-RBH, 2015 WL 1862794, at *7 (D.S.C. Apr. 23, 2015). "Mere conjecture or speculation that additional evidence might have been obtained is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

Nevertheless, the record as to Plaintiff's vision complaints suggests further development was required. Plaintiff initially complained to Dr. Lenes of vision deficits, redness, mattering, and left eye dryness on November 17, 2020, and requested to see an eye doctor. Tr. at 397. Dr. Lenes noted conjunctive erythema in Plaintiff's left eye, assessed dry eyes, instructed Plaintiff to use artificial tears, and discussed visiting an optometrist and using Zenni for glasses. *Id.* Plaintiff reported worsening vision problems on July 20, 2021, and requested an eye appointment. Tr. at 481. Dr. Lenes observed redness, marked conjunctival erythema, and down-going left eyelid and indicated Plaintiff should make an appointment with Storm Eye to reevaluate his left eye. *Id.* Unfortunately, the record does not indicate Plaintiff followed up with an optometrist or ophthalmologist.

Plaintiff reported eye- and vision-related complaints to the SSA, as well. He complained of left eye dryness, wateriness, and blurring, and Dr. Maguire assessed 20/30 visual acuity without glasses. Tr. at 456. Plaintiff noted problems in two vision questionnaires.[8] Tr. at 346–47, 360. He testified to problems with his left eye during the hearing. Tr. at 58.

---

[8] Plaintiff completed a vision questionnaire on May 3, 2021. Tr. at 346–47. He indicated his vision problems prevented him from "se[e]ing straight" and his left eye was "very blurry." *Id.* He stated he was able to count change, use a stove/microwave, and watch television, but did not manage his own money, drive, or read the newspaper/books. *Id.* He noted he had problems bumping into or tripping over things, seeing steps or curbs, or walking on uneven

Most importantly, on November 8, 2021, state agency consultant Harry G. Randall, M.D. ("Dr. Randall"), an ophthalmologist, evaluated the record and wrote:

> The claimant alleges stroke and poor vision. There is no report of an eye exam. In order to evaluate the severity of the claimant's visual impairment it is necessary to have a report of an eye exam with best corrected visual acuities and, wit[h] a history of stroke, Humphrey 30-2 visual fields.

Tr. at 483. Although the record does contain Dr. Maguire's assessment of 20/30 visual acuity, Dr. Randall indicated additional evidence was necessary to evaluate whether Plaintiff's visual impairment imposed functional limitations.

Despite this evidence, the ALJ did not refer Plaintiff for a consultative eye exam or address any evidence of visual impairment in the decision, aside from noting Plaintiff had reported intermittent blurry vision to Dr. Maguire. Tr. at 38. It appears the ALJ should have referred Plaintiff for a consultative exam in accordance with 20 C.F.R. § 404.1519a(b) and § 416.919a(b). Dr. Randall indicated additional evidence was needed that was not included in

---

pavement due to "blurry vision" and "lost depth perception," in addition to being "uncoordinated" and experiencing headaches and vertigo. Tr. at 347. A second vision questionnaire is undated. Tr. at 360. Plaintiff noted his vision kept him from reading books and a computer screen, but he was able to manage money, count change, use the stove/microwave, watch a 32" television, and read large-print books and newspapers. *Id.* He indicated blurriness in his left eye caused him to bump into or trip over things and have problems seeing steps or curbs and walking on uneven pavement. *Id.* He said he had blind spots in his left eye vision and mostly used his right eye. *Id.*

the record from Plaintiff's medical sources, and the current severity of Plaintiff's visual impairment was not established, as Dr. Maguire's assessment was not sufficiently comprehensive. *See* 20 C.F.R. §§ 404.1519a(b), 416.919a(b).

Although it is unclear which, if any, functional impairments to Plaintiff's vision a consultative exam may reveal, Plaintiff presents a compelling argument of prejudice given the evidence of possible visual impairment. In his decision, the ALJ relied on the three jobs identified by the VE to meet his burden at step five. *See* Tr. at 42. The job of marker is described by the *DOT* as requiring frequent near acuity. 209.587-034, Marker. *DOT* (4th Ed., revised 1991), 1991 WL 671802. *The* DOT describes the job of rental clerk as requiring frequent far acuity. 295.267-026, Storage-Facility Rental Clerk. *DOT* (4th Ed., revised 1991), 1991 WL 672594. It indicates the job of small product assembler requires frequent near acuity, depth perception, and accommodation. 706.684-022, Assembler, Small Products I. *DOT* (4th Ed., revised 1991), 1991 WL 679050. Because Plaintiff presented evidence of visual impairment, and the ALJ found he had the RFC to perform three jobs that required frequent visual functions, it is reasonable to assume further development of the record may show his visual impairments would prevent him from performing some or all of jobs the ALJ relied on to support a finding of non-disability at step five.

In light of the foregoing, the undersigned is constrained to find the ALJ did not adequately develop the record as to Plaintiff's visual impairment. Thus, it appears a consultative examination is necessary and should include an eye exam with best corrected visual acuities and Humphrey 30-2 visual fields, as well as an assessment of vision-related functional limitations.

### 2. Concentration, Persistence, or Pace

Plaintiff argues the ALJ's RFC assessment does not account for his mild limitations in maintaining concentration, persistence, or pace. [ECF No. 13 at 19]. He claims that after rating the degree of his limitation to concentration, persistence, or pace, the ALJ neither explained how the limitation affected his RFC nor included any restrictions regarding the ability to stay on task in the RFC assessment. *Id.* at 20–23.

The Commissioner maintains the ALJ reasonably found that Plaintiff's mild restriction in concentration, persistence, or pace did not result in any vocational restrictions. [ECF No. 14 at 20]. He points out the ALJ relied on Dr. Hadley's opinion in considering the restriction and her conclusion that the mild limitation did not result in any functional limitations. *Id.* at 20–21. He argues the ALJ's assessment of a mild—as opposed to a moderate, marked, or extreme—limitation supports his finding that Plaintiff's ability to do basic work activities was not affected. *Id.* at 22.

In evaluating mental impairments, an ALJ must "rate the degree of [the claimant's] functional limitation based on the extent to which [his] impairments interfere with [his] ability to function independently, appropriately, effectively, and on a sustained basis," which may require evaluation of "the quality and level of [his] overall functional performance, any episodic limitations, the amount of supervision or assistance [he] require[s], and the settings in which [he is] able to function." 20 C.F.R. § 404.1520a(c)(2). Pursuant to 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3), concentrating, persisting, or maintaining pace:

> [R]efers to the ability to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number and length of rest periods during the day.

A mild degree of limitation is consistent with only slightly limited ability to function independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(F)(2)(b).

The RFC assessment must be based on all the relevant evidence in the case record and should account for all the claimant's medically-determinable impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). It must include a

narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (1996); *see also* 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1) (providing the ALJ must specifically "consider all relevant and available clinical signs and laboratory findings, the effects of [the claimant's] symptoms, and how [her] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment"). The ALJ must "consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1). He must explain how any material inconsistencies or ambiguities in the record were resolved. SSR 96-8p, 1996 WL 374184, at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

The ALJ found Plaintiff had only mild limitation in concentrating, persisting, or maintaining pace and noted he "ha[d] not exhibited any

significant concentration deficits, and stated he enjoys reading." Tr. at 36. He

wrote:

> The claimant's medically determinable mental impairment of
> depression does not cause more than minimal limitation in the
> claimant's ability to perform basic mental work activities and is
> therefore non-severe. In May 2021, the claimant's physician at
> Harvest Free Medical Clinic, Martin Smith, M.D., stated that he
> has not treated the claimant for any mental problem and did not
> recommend psychiatric treatment. (Exhibit B1F).

Tr. at 35. He further indicated:

> The limitations identified in the "paragraph B" criteria are not a
> residual functional capacity assessment, but are used to rate the
> severity of mental impairments at steps 2 and 3 of the sequential
> evaluation process. The mental residual functional capacity used
> at steps 4 and 5 of the sequential evaluation process requires a
> more detailed assessment. The following residual functional
> capacity assessment reflects the degree of limitation I have found
> in the "paragraph B" mental function analysis.

Tr. at 36. Despite this language, the ALJ did not include any mental

restrictions in the RFC assessment. *See* Tr. at 37.

In *Mascio v. Colvin*, 780 F.3d 632, 637–38 (4th Cir. 2015), the court

considered an ALJ's failure to include mental restrictions in a hypothetical

question presented to a VE and in the RFC assessment, despite having found

the claimant had moderate difficulties in maintaining concentration,

persistence, or pace. The court found "remand [was] in order" because the

ALJ did not explain how the "moderate limitation in concentration,

persistence, or pace at step three" failed to "translate into a limitation in

Mascio's residual functional capacity." *Id.* at 638.

This case differs from *Mascio* in that the ALJ assessed mild, as opposed to moderate, limitations in Plaintiff's ability to concentrate, persist, or maintain pace. *See Moyers v. Comm'r of Soc. Sec. Admin.*, C/A No. SAG-17-357, 2018 WL 1471459, at *4 (D. Md. Jan. 5, 2018) (noting *Mascio* does not impose a "requirement that a finding of 'mild' difficulty in concentration, persistence, or pace must translate to a correlating limitation in the RFC assessment"); *Brooks v. Berryhill*, C/A No. 3:15-440-RJC, 2017 WL 1196449, at *4 (W.D.N.C. Mar. 29, 2017) ("Mascio dealt with 'moderate' restrictions and did not hold that all restrictions, including mild restrictions, be explicitly discussed in terms of RFC.").

The Fourth Circuit has not addressed whether ALJs must include restrictions in RFC assessments to account for mild limitations in concentration, persistence, or pace or explain their reasons for declining to do so. District courts in the Fourth Circuit have reached different conclusions upon addressing the issue. *See Clark v. Kijakazi*, C/A No. 5:22-460-KDW, 2023 WL 3719807, at *10–11 (D.S.C. May 30, 2023) (rejecting the plaintiff's argument that the ALJ was required to provide further discussion of his finding of mild limitations in concentrating, persisting, or maintain pace in the RFC assessment); *Anderson v. Kijakazi*, C/A No. 2:20-3237-MBS, 2022 WL 391549, at *4–5 (D.S.C. Feb. 9, 2022) (finding "the ALJ erred when he omitted from his RFC assessment a limitation that reflects his finding of

Plaintiff's mild mental impairments *and* failed to state why any such limitation is not necessary") (emphasis in original); *Sellers v. Saul*, C/A No. 1:19-272-JRC, 2021 WL 1166758, at *5 (W.D.N.C. Mar. 26, 2021) (declining to remand the case based on the ALJ's failure to account for mild limitations in concentrating, persisting, or maintaining pace in the RFC assessment); *Martin v. Saul*, C/A No. 9:18-3172-JMC-BM, 2020 WL 2813788, at *8 (D.S.C. Jan. 16, 2020), *report and recommendation adopted by* 1329395 (Mar. 23, 2020) (collecting cases and noting most district courts have found no error in ALJs' failures to account for mild limitations in the broad areas of mental functioning in RFC assessments); *Ashcraft v. Colvin*, C/A No. 3:13-417, 2015 WL 9304561, at *6–11 (W.D.N.C. Dec. 21, 2015) (finding the ALJ failed to meet his duty of explanation when he did not consider the plaintiff's mild limitations in the broad areas of mental functioning and discuss them in the RFC analysis). Thus, there is no compelling authority directing the court to affirm or remand on this issue.

Nevertheless, in light of the above finding for remand, it appears the best course of action would be for the ALJ to revisit the issue. If the ALJ finds a mild limitation in concentrating, persisting, or maintaining pace or in any of the other broad areas of mental functioning, it would be best practice for him to explain how such an assessment translates into specific functional limitations in the RFC assessment or results in no functional limitations.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

January 22, 2024                                    Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

41